The **RETIREMENT BOARD OF the EMPLOYEES' RETIREMENT SYSTEM OF the STATE of Rhode Island and CITY OF CRANSTON**

v.

**Raymond J. AZAR.**

**No. 97–351–Appeal.**

Supreme Court of Rhode Island.

Dec. 11, 1998.

Thomas A. Palombo, Providence, for Plaintiff.

Susan Carlin, John A. Baglini, Stephen R. Famiglietti, Patrick J. Quinlan, Providence, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

We review here a Superior Court judgment carving up the pension of a corrupt, former municipal employee. Attempting to redress the financial wounds inflicted by this employee's venality, the trial justice allocated the employee's pension among the retired employee, his dependent brother, certain of his other relatives, and his former municipal employer. For the reasons explained below, (1) we reverse and vacate certain portions of the judgment that have been challenged on appeal: namely, (a) the use of the employee's revoked pension benefits to repay his relatives' loans to him, and (b) the eventual reinstatement of the employee's pension; and (2) we affirm the remainder of the judgment.

### Facts and Travel

After he retired from his job as Public Works Director for the City of Cranston (city) and began to collect his pension, defendant, Raymond J. Azar (defendant or Azar), was convicted of racketeering for accepting bribes and other favors in exchange for allowing contractors to overcharge the city on various construction projects. For over six years while he was serving as the city's Public Works Director, defendant engaged in a pattern of criminal conduct that sorely abused the public trust reposed in him. Upon learning of Azar's treachery and seeking to revoke his pension, the Retirement Board (board) of the Employees' Retirement System of the State of Rhode Island (retirement system) filed a Superior Court lawsuit against him under the Public Employee Pension Revocation and Reduction Act (PE-PRRA), G.L.1956 chapter 10.1 of title 36.

The board appeals from the judgment that entered as a result of this lawsuit, and defendant has filed a cross appeal challenging the constitutionality of any reduction of his pension benefits. A Superior Court justice ordered the retirement system to pay monthly pension benefits to defendant in trust and

then ordered him, as trustee, to use the pension funds: (1) to pay $1500 per month for the living expenses of Dennis Azar, defendant's mentally disabled and dependent brother; (2) to reimburse the city for the remaining financial losses defendant had caused it to sustain (earlier, defendant had made a partial restitutionary payment to the city); and (3) to repay monies loaned to defendant by his brothers, sisters, and nephew (relatives) to enable him to make the earlier, partial restitutionary payment to the city for a portion of the losses he had caused it to suffer. Upon defendant's repayment of the debts he owed to the city and his relatives via the monthly pension benefits that were to be paid to him in the future, the court ordered that the retirement system reinstate the monthly pension payments for defendant's own use, subject only to his ongoing responsibility to devote the first $1500 of such payments to care for his dependent brother. We proceed now to address the issues raised by the parties' appeals.

## I.

### Mandatory vs. Discretionary Pension Revocation or Reduction

The board argues on appeal that PEPRRA categorically prohibits retired public employees/officials from receiving any part of their public pensions if any portion of their service was dishonorable. Because of PEPRRA's express provisions giving the trial justice discretion to permit a pension reduction for dishonorable service rather than mandating a complete revocation, we disagree with this aspect of the board's argument. Nevertheless, we hold that, given the substantial benefits defendant already has derived from the pension payments he has received to date, and the substantial benefits he will derive from the city's settlement of its restitution claims against him (in exchange

for receiving $210,000 of Azar's future pension monies), the trial justice abused his discretion under PEPRRA by providing for the eventual reinstatement of defendant's public pension.[1]

PEPRRA sets forth a multi-factored analysis for the trial justice to use in deciding whether to revoke or reduce the pension benefits of a public employee/official who has been convicted of a job-related crime. After indicating that honorable service is presumed and required before it will allow payment of retirement benefits, PEPRRA requires the trial justice to analyze whether the pension to which the "(ii) * * * public [employee/official] *is otherwise entitled* should be revoked *or diminished* and, if so; (iii)[i]n what amount or *by what proportion* such revocation or reduction should be ordered." Section 36–10.1–3(c)(1)(ii), (iii). (Emphases added.) Read together, these two provisions indicate a legislative intention for the trial justice to make a discretionary determination whether to reduce or revoke, in whole or in part, the pension that the public employee/official would otherwise be entitled to receive but for having been convicted of a crime relating to his or her public office. The role of the trial justice is not, as the board would urge, to attempt a total recomputation of what pension, if any, the public employee/official is otherwise entitled to receive. That remains the *function of the* retirement system.[2] Nor does the statute necessarily require the trial justice to subtract those years of dishonorable service from the employee/official's overall years of public employment because they were proven to be dishonorable. Although PEPRRA might permit the trial justice to alter the methodology used to calculate the pension that a public employee is otherwise entitled to collect, he or she is not required by law to do so. Rather, any pension reduction or

1. The board, however, does not challenge that portion of the judgment providing for monthly payments, in trust, to Dennis Azar, nor does it object to those portions of the judgment requiring that pension payments be made to Azar in trust for repayment of the city until Azar's debt to that municipality is extinguished. Therefore, we have no warrant to disturb these aspects of the judgment.

2. General Laws 1956 §§ 36–10–1 to –4, –6 to –9.4, –9.6 to –24, –31 to –39; G.L.1956 §§ 16–15–13 to –17; G.L.1956 § 45–21.1–1; G.L.1956 §§ 8–3–13 to –14; G.L.1956 §§ 28–30–1 to –4.1, –5 to –23; G.L.1956 §§ 31–43–1 to –7, –9 to –17; G.L.1956 §§ 42–28–1 to –37, –45 to –49.

revocation should be made in accordance with PEPRRA's provisions—that is, a revocation or diminution of this "otherwise entitled" pension benefit by whatever "amount or * * * proportion," if any, that the Superior Court shall determine after weighing the requirement of honorable service, the severity of the crime, the amount of monetary loss caused by the employee's misconduct, the degree of public trust reposed in the employee, and such other factors as the court believes justice requires it to consider. Section 36–10.1–3(c)(1)(ii), (iii), (2).

■ The board's reading of PEPRRA—namely, "dishonorable service means no pension"—would obviate the need for PEPRRA altogether. The General Assembly obviously would not have gone to the trouble of enacting PEPRRA—with its mandated consideration of three basic questions pursuant to a multi-factored and largely discretionary balancing test (see § 36–10.1–3(c)(2))—if it really intended to eliminate all possibility of a public employee/official receiving any pension at all after he or she had been convicted of a crime related to any portion of his or her public service, however small and relatively inconsequential that period may have been in relation to the total years of such service. See Brennan v. Kirby, 529 A.2d 633, 637 (R.I.1987) (stating that courts should not construe a statute "in a way that would attribute to the Legislature an intent that would * * * defeat the underlying purpose of the enactment"); see also Kirby v. Planning Board of Review of Middletown, 634 A.2d 285, 290 (R.I.1993) (same). Moreover, the board's suggested interpretation of PEPRRA (dishonorable service means no pension) was precisely the state of the common law with respect to pension revocation or reduction before the enactment of PEPRRA. See Matter of Almeida, 611 A.2d 1375 (R.I.1992). And yet, as we have noted previously, the General Assembly intended PEPRRA to supersede Almeida's pension revocation or reduction mandate. See Smith v. Retirement Board of the Employees' Retirement System of Rhode Island, 656 A.2d 186, 190 (R.I. 1995). Consequently, the trial justice was not required, as the board asserts, to revoke defendant's entire pension simply because portions of his thirty-two years of public service were shown to be dishonorable. On the contrary, the trial justice was required to undertake PEPRRA's statutorily prescribed, multi-factored analysis to decide "(ii) [w]hether the retirement or other benefits or payments to which the public official or public employee is otherwise entitled should be revoked or diminished and, if so; (iii)[i]n what amount or by what proportion such revocation or reduction should be ordered." Section 36–10.1–3(c)(1)(ii), (iii).

Here, the trial justice did assay such an analysis. However, our review of PEPRRA's five determinative factors—as applied to the circumstances of this case—causes us to conclude that the trial justice abused his discretion in allowing for the eventual reinstatement of defendant's pension benefits. First, nearly all of defendant's service as the city's Director of Public Works was unequivocally dishonorable. The malfeasance in question was not an isolated, one-time transgression, but a multi-year, long-term course of conduct involving the loss of hundreds of thousands of public dollars pursuant to which defendant lined his own pockets with his ill-gotten gains. Second, the nature of defendant's misconduct, namely, criminal racketeering, was very grave in relation to the relatively high degree of discretion and responsibility inherent in his public office. The defendant's admission of his wrongdoing—a factor upon which the trial justice placed great weight—does not mitigate its severity. Third, the city suffered a substantial loss as a result of defendant's conduct—approximately $435,000—while he personally profited from the bribes and other gratuities that were furnished to him. Fourth, the city and its taxpayers reposed a substantial quantum of trust in defendant. At a minimum, he was in a position to allow construction contractors to overcharge the city hundreds of thousands of dollars.

Finally, notwithstanding the enormity of his wrongdoing, defendant already has received substantial benefits from his pension. Specifically, defendant has received and benefited from pension payments in excess of $320,000 that were paid to him during the five-year period that the board's unresolved PEPRRA suit has been pending in the

courts. Moreover, because the board chose not to appeal that portion of the Superior Court's judgment that ordered payment of his revoked pension benefits to the city, defendant thereby will be relieved not only from his obligation to defend against the city's federal lawsuit seeking restitution from him, but also from his prospective liability to the city for an additional $210,000. Although, for the reasons described below, we do not believe that PEPRRA authorized the trial justice to order this payment to the city, the board chose not to appeal this part of the judgment, and therefore, we do not disturb this aspect of the court's ruling. However, the board has challenged that part of the judgment that reinstates defendant's pension benefits after certain of his relatives and the city have been reimbursed completely for their losses. It is this windfall—namely, the eventual reinstatement of Azar's pension benefits—that we do reverse because we conclude that, given the egregious circumstances of defendant's violation of his public trust and the hundreds of thousands of dollars worth of benefits he already has received to date and will receive in the future, it was an abuse of the trial justice's discretion under these circumstances to order such a reinstatement.

## II.

### Repayment of Loans From Relatives

■ The board also argues that the trial justice erred in ordering Azar to use his pension benefits to repay the loans he received from his relatives. We agree. Although PEPRRA grants the trial justice substantial discretion to determine whether to revoke or reduce a public employee/official's public pension after he or she has been convicted of a crime related to public employment, it authorizes payment of the revoked or reduced pension funds only to a pensioner's innocent spouse, dependents, and/or designated beneficiaries. Because defendant's relatives and other non-judgment creditors do not fall within any of these three enumerated categories of payees, the trial justice exceeded his authority in ordering defendant to pay any portion of his revoked or reduced pension benefits to them.

■ Section 36–10.1–3(d) of PEPRRA provides:

"If the superior court determines that the retirement or other benefits or payments of a public official or public employee should be revoked or reduced under this chapter, it may, in its discretion and after taking into consideration the financial needs and resources of any innocent spouse, dependents and/or designated beneficiaries of the public official or public employee, order that some or all of the revoked or reduced benefits or payments *be paid to any innocent spouse, dependent or beneficiary as justice may require.*" (Emphasis added.)

After considering the financial needs and resources of any innocent spouse, dependents, and/or designated beneficiaries of the public employee/official, a trial justice has the discretion under PEPRRA to order payment of some or all of the pensioner's revoked or reduced benefits to "any innocent spouse, dependent or [designated] beneficiary."[3] By specifying only three types of payees who may receive a public employee/official's revoked or reduced pension benefits, we are of the opinion that the General Assembly manifested its intent to exclude other possible payees from receiving such monies. Accordingly, applying the statutory-construction principle of expressio unius est exclusio alterius, we conclude that any party who is not an

---

3. Although not argued by defendant, PEPRRA provides that the trial justice shall consider the financial needs of, inter alia, "designated beneficiaries." It then provides that the trial justice may order payment to any "beneficiary," omitting the earlier modifier "designated" from this second mention of the term. It may be argued that, by omitting the word "designated" from this second mention of the word "beneficiary" when discussing potential third-party payees of the revoked pension benefits, the General Assem-

bly intended that the potential payees need not be "designated" beneficiaries, but rather may be any individual arguably qualifying as a mere beneficiary of the pensioner. Although this second use of the term "beneficiary" appears to us to be just a shorthand reference back to PEPRRA's earlier mention of "designated beneficiaries" in the same sentence, we need not decide this issue because the relatives were not shown to be qualified as either "designated" or otherwise existing beneficiaries of Azar.

innocent spouse, dependent, or designated beneficiary of the pensioner is not eligible to receive any of his or her revoked or reduced pension benefits. The defendant's relatives do not fall within any of these three enumerated categories. First, none is married to defendant. Second, Azar's relatives are not ipso facto his dependents. Third, none of these relatives qualified as designated beneficiaries under his pension plan, nor was any evidence introduced establishing their status as some kind of other beneficiary vis-à-vis Azar before the trial justice amended the judgment to establish them as such.

Section 36–10.1–4 of PEPRRA further buttresses our conclusion that the General Assembly did not intend for a pensioner's mere non-judgment creditors to recover their debts through a mandated diversion of the public employee/official's pension benefits. Specifically, § 36–10.1–4(a) provides that a public employee/official whose pension has been revoked is entitled to a return of his or her contribution paid into the pension fund.[4] Subsection (b) provides that a public employee/official subject to pension reduction is "entitled to a pro rata return of a portion of his or her contribution paid into the relevant pension fund(s) in an amount proportionate to the amount of any such reduction, without interest." Section 36–10.1–4(b). Finally, subsection (c) of § 36–10.1–4 provides that:

"Notwithstanding the provisions of subsections (a) and (b) of this section, no payments in return of contributions shall be made or ordered unless and until the superior court determines that the public official or public employee whose retirement or other benefits or payments have been revoked or reduced under this chapter has satisfied in full any judgments or orders rendered by any court of competent jurisdiction for the payment of restitution for losses incurred by any person as a result of the subject crime related to public office or public employment. If the superior court determines that the public official

or employee whose retirement or other benefits or payments have been revoked or reduced under this chapter has failed to satisfy any outstanding judgment or order of restitution rendered by any court of competent jurisdiction, it may order that any funds otherwise due to the public official or public employee as a return of contribution, or any portion thereof, be paid in satisfaction of the judgment or order."

Nowhere in these three subsections does the General Assembly allow pension benefits to be used for payments to mere non-judgment creditors of the pensioner. However, subsection (c) of § 36–10.1–4 does provide for the possibility of a prioritized payment to judgment creditors for restitution of any losses caused by the pensioner's crimes—but only by using contributed funds that otherwise would have to be returned to the pensioner after revoking his or her pension. Even then, the retirement system only can make such payments to judgment creditors whose obligations remain unsatisfied by the pensioner. Given these express provisions of PEPRRA, it would be anomalous to allow mere non-judgment creditors (let alone related lenders, as in the present case) to leapfrog over judgment creditors in their receipt of the public employee/official's pension benefits. Such a reading of PEPRRA would render nugatory § 36–10.1–4's express provisions allowing judgment creditors to be paid through a reallocation of the pensioner's much smaller retirement contributions. But these provisions do not allow the trial justice to utilize the larger amounts that would be available if the revoked or reduced pension benefits could be tapped to do so.

▮ Although the judgment, as amended, ordered payment of Azar's pension benefits in trust to him, and not directly to his relatives, we look to the identity of the final payee of the benefits in deciding whether the trial justice acted within his or her discretion in fashioning an appropriate PEPRRA order.

---

4. Although the court must first revoke or reduce the public employee/official's pension before it can order payments of such benefits to any spouse, dependent, and/or designated beneficiary, the pensioner is not entitled to a return of any contributions attributable to such diverted pen-

sion benefits. Otherwise, the pensioner would receive a double benefit and the retirement system would suffer a double penalty by paying out both pension benefits and the allocable contributions relating to such benefits.

We are of the opinion that it would violate the plain language of PEPRRA to allow the trial justice to accomplish via the order or judgment in a given case what PEPRRA does not otherwise permit: namely, that a revoked or reduced pension payment be made directly to a convicted pensioner's mere relatives or other non-judgment creditors who do not qualify as a spouse, dependent, or designated beneficiary of the pensioner. We therefore reverse that portion of the judgment ordering repayment of the relatives' loans from Azar's pension funds, as this aspect of the trial justice's ruling was not within his discretion.

### III.

### Constitutionality of PEPRRA

■ Lastly, we deny and dismiss defendant's cross appeal, wherein he claims that PEPRRA violates the constitutional prohibitions against double jeopardy and cruel and unusual punishment. Applying the analysis set forth in *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), to PEPRRA's pension revocation and reduction provisions, we conclude that PEPRRA provides for a civil sanction that, under the circumstances, violates neither the prohibition against double jeopardy nor the bar against cruel and unusual punishment.

### A. Double Jeopardy

■ The Double Jeopardy Clause proscribes the imposition of multiple criminal punishments for the same offense in successive proceedings. *See Hudson,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450. To determine whether a post-conviction sanction is criminal or civil in nature, a reviewing court first must examine the face of the statute. If the statute explicitly denotes its civil character, then the punishment is presumed to be civil in nature. Second, the court must look

to the statute's purpose and effect. Only the clearest proof that the purpose and effect of the statute is to exact criminal punishment will rebut a presumption that the statute provides for only a civil sanction. *See id.*[5]

PEPRRA explicitly provides that if a public employee/official has committed a "crime related to [his] public office or public employment," then the board shall "[i]nitiate a *civil* action * * * for the revocation or reduction of any retirement or other benefit * * *." Section 36–10.1–3(b)(1). (Emphasis added.) In addition, the Act repeatedly designates the board's action in seeking the revocation or reduction of pension benefits as civil in nature. Chapter 10.1 of title 36. Therefore, under *Hudson,* a presumption exists that a PEPRRA sanction is in fact civil in nature. The defendant may overcome this presumption only by showing, via the clearest proof, that the purpose and effect of PEPRRA is to exact criminal punishment. We are of the opinion that PEPRRA's pension reduction or revocation is not tantamount to criminal punishment. Rather, it is analogous to the statute scrutinized in *Hudson,* in that it explicitly denotes its civil character and places civil authority in an adjudicative entity to enforce its provisions through monetary penalties. *Hudson,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450.

■ In addition, applying *Hudson*'s factors to PEPRRA further demonstrates its civil nature. First, an "affirmative disability or restraint" requires imprisonment or some sanction "approaching * * * imprisonment." *Hudson,* 522 U.S. at —, 118 S.Ct. at 496, 139 L.Ed.2d at 462 (holding that debarment of banking officers' licenses is not an affirmative disability or restraint). Thus, revocation or reduction of a public pension does not constitute an affirmative disability or restraint. Second, revocation or reduction of a pension historically has not been regarded as

---

**5.** "[T]he [following] factors * * * provide useful guideposts * * *: (1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of scienter'; (4) 'whether its operation will promote the traditional aims of punishment-retribution and deterrence'; (5) 'whether the behavior to which it applies is al-

ready a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.'" *Hudson v. United States,* 522 U.S. 93, —, 118 S.Ct. 488, 493, 139 L.Ed.2d 450, 459 (1997) (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963)).

a criminal punishment. Instead, a public employee/official's pre-PEPRRA entitlement to receive a pension was implicitly conditioned on honorable completion of public service. See Almeida, 611 A.2d at 1383. Even under PEPRRA, when the public employee/official does not satisfy this sine qua non of his employment, his or her right to receive a public pension is likewise revocable or reducible. See id. Third, the possibility of a reduction or revocation of a former public employee/official's pension does not serve to exact retribution, but again, is the ineluctable consequence of his or her failure to satisfy an inherent condition of his or her public employment. See id. Fourth, it can hardly be argued that a revocation or reduction of pension benefits is excessive when the public employee/official fails to satisfy a basic condition precedent to the receipt of such funds. Finally, the Act applies to any public employee or official who committed a crime or crimes related to his or her public office. Although such crimes usually, if not invariably, involve some "finding of scienter," this one factor does not constitute the clearest proof of the statute's criminal purpose and effect because it does not, on balance, override the other factors confirming the Act's presumptive civil nature. Consequently, because PEPRRA does not exact a criminal punishment, revocation or reduction of defendant's pension does not violate the prohibition against double jeopardy.

## B. Cruel and Unusual Punishment

▮▮▮▮ Article 1, section 8, of the Rhode Island Constitution prohibits any court from exacting penalties disproportionate to the offense charged. See State v. Ouimette, 479 A.2d 702, 706 (R.I.1984). Likewise, as a matter of federal constitutional law, a court at a minimum may not impose a sanction that is grossly disproportionate to the offense charged. Compare Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (affirming the imposition of a mandatory lifetime sentence for the defendant's conviction for possession of over 670 grams of cocaine), with Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (overturning a sentence of life imprisonment without parole because the sen-

tence's disproportionality in relation to the charged crimes violated the Eighth Amendment). To determine whether a punishment is either disproportionate (in violation of our state constitution) or grossly disproportionate to the offense charged (in violation of the Eighth Amendment to the federal Constitution), a court should analyze: (1) the gravity of the offense along with the harshness of the penalty, and if applicable, (2) the sentences imposed upon similarly situated offenders in this and/or other jurisdictions. See Ouimette, 479 A.2d at 706; Solem, 463 U.S. at 290–92, 103 S.Ct. at 3010–11, 77 L.Ed.2d at 649–50. For the reasons discussed herein, we hold that the penalty imposed on defendant is not disproportionate to the magnitude of his crime.

Almeida analyzed the harshness of the pension revocation in that case in light of that defendant's dishonorable service as a Superior Court justice. In Almeida, we stated that:

"termination of petitioner's pension is not disproportionate in comparison to the offenses he admittedly committed. By his judicial misconduct, [he] has breached the public trust by committing acts violative of his honored position as a respected jurist. His actions motivated by the desire for personal gain have operated to harm the public trust and confidence in the Judiciary as a whole and to affect adversely the honor and integrity of the very position he held and the capacity in which he served." Almeida, 611 A.2d at 1388.

Although Almeida involved the conduct of a state judge, the Court in no way limited the applicability of its reasoning to the reduction or revocation of judicial pensions. On the contrary, Almeida's rationale is equally applicable to a pension revocation or reduction for other public employees and officials who are convicted of crimes relating to their public office or employment. Moreover, although we based some of our reasoning in Almeida on that public official's former position as a Superior Court justice and the consequent damage he caused to the public trust reposed in the entire Judiciary, the fact that defendant in the case at bar was not a judge does not mean that his office did not

also involve a substantial measure of public trust. As the city's Director of Public Works, defendant was in a position where he could allow the city and its taxpayers to be overcharged by $435,000 while he personally profited at the taxpayers' expense. Indeed, given the magnitude and duration of Azar's wrongdoing, even if the trial justice here had ordered a complete revocation of defendant's pension, his decision would not have constituted cruel and unusual punishment.

Nevertheless, the trial justice, though endowed with the discretionary power to order a complete pension revocation, chose not to do so. Instead, to enable the defendant to make restitution for his own wrongdoing, the court ordered payment of his pension benefits to the defendant's dependent brother, to his related creditors, and to the city, and even allowed the defendant to keep future pension payments for himself. Although we reverse those portions of the judgment ordering the eventual reinstatement of the defendant's pension benefits and requiring payments of benefits to those relatives who lent him money, the defendant still will have had the benefit of hundreds of thousands of dollars worth of pension payments that have been or will be paid to himself and to the city, despite his dishonorable service and criminal misconduct. Thus, neither the original nor the amended judgment in this case has punished the defendant so cruelly and unusually that it would violate the Rhode Island and federal constitutional bars against such punishments.

### Conclusion

Although PEPRRA did not require him to revoke the defendant's public pension in its entirety, the trial justice in this instance abused his discretion in ordering certain portions of the defendant's pension benefits to be paid to the defendant himself and to the defendant's relatives. Therefore, we vacate those portions of the Superior Court judgment without disturbing those unchallenged portions that provide for the payments of pension monies to Dennis Azar and to the City of Cranston. Finally, we reject the defendant's claims that his constitutional rights to be protected against double jeopardy and cruel and unusual punishment have been violated in this case. Therefore, we reverse in part and affirm in part, and remand the papers in this case to the Superior Court for the entry of an amended judgment consistent with this opinion.